IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 97-40022

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

JACK MANNING MEADOR, JANE MEADOR COOK,
JOHN STEPHEN TORIGIAN,

Defendants-Appellees,

Appeal from the United States District Court
For the Eastern District of Texas

April 13, 1998

Before HIGGINBOTHAM, JONES and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The United States appeals the dismissal of the felony indictment of three Texans as barred by the statute of limitations. We must decide whether the indictment is saved by the suspension of the limitations period Congress granted to allow pursuit of evidence in foreign countries. This requires decision of what constitutes "final action" within the meaning of the suspension provision in 18 U.S.C. § 3292(b).

The district court held that when a foreign government regards its efforts to satisfy an "official request" by the United States government as complete and communicates that fact to the United States government, it takes "final action" for the purposes of 18 U.S.C. § 3292(b), regardless of whether the foreign government's closing of the matter proves in time to have been incorrect. We agree.

I.

This case takes us to events more than fifty years ago in Nazi Germany. In the summer of 1945, as World War II was just concluding, American troops maintained the peace for Allied forces in Quedlinburg, Germany, a town that dates back to medieval times.

Precious items had been placed for safekeeping in an abandoned mine southwest of the town. After U.S. troops withdrew from the area, several important pieces were missing. The missing artifacts included the "Samuhel-Evangeliar", a ninth century medieval manuscript written entirely in goldSSthe "Samuhel Gospels," and the "Evangelistar aus St. Wiperti," a sixteenth century prayer bookSSthe "Prayer Book".

Joe T. Meador, a young American serviceman, was part of the Allied force in Quedlinburg. During this time, he sent several packages to his family in Whitewright, Texas. By his letters, the packages contained at least two of the missing items. The Government alleged in its indictment that Joe Meador stole the artifacts from the church treasury in Quedlinburg, Germany on or

about April 19, 1945, when he was stationed there. On Joe Meador's death, his brother, Jack Manning Meador, and sister, Jane Meador Cook, inherited his possessions and belongings. Among those items were the Samuhel Gospels and the Prayer Book.

Difficult financial times came, and Jane Cook and Jack Meador decided to sell the Samuhel Gospels and the Prayer Book. They retained defendant John Stephen Torigian, a Houston attorney, who assured them that they had good title to the treasures through the Texas laws of inheritancy. They then decided to sell these manuscripts with Torigian's help.

The effort to sell the manuscripts was no clandestine enterprise. Torigian hired an expert in medieval manuscripts, Jacques Quentin, of Geneva, Switzerland to authenticate the manuscripts and assist in their sale. In 1988, Torigian opened a Swiss bank account and thereafter leased two safety deposit boxes from the same bank in Zurich. Torigian then began sending letters and photographs of the two manuscripts to various museums and art and manuscript dealers in the United States and Europe for the purpose of selling these manuscripts. Heribert Tenschert, a Bavarian book dealer in Passau, Germany expressed an interest in the manuscripts. In 1990, Torigian allowed Tenschert to examine the Samuhel Gospels. Tenschert then approached Dr. Klaus Maurice, the Secretary-General of the Cultural Foundation of the States in Berlin, Germany to obtain funding for the purchase of the Samuhel Gospels.

Acting for the Foundation, Dr. Maurice authorized Tenschert to purchase the Samuhel Gospels from Torigian for three million dollars. As part of his agreement with Torigian, Tenschert deposited funds into Torigian's Swiss bank account and took possession of the Samuhel Gospels. All parties agree that the last of these transactions took place on May 9, 1990.

Eventually, other parties got wind of the situation. The Church in Quedlinburg filed suit in Whitewright, Texas, seeking return of the rest of the treasures. As a settlement of this suit, the Church paid one million dollars for the artifacts. After this sale, the United States Government began investigating the transactions concerning the two manuscripts.

Because the United States cannot directly investigate a crime and gather evidence in a foreign country, on March 2, 1995, the Government made an official request to the Ministry of Justice of the Federal Republic of Germany for certain evidence located in Germany pertinent to the investigation of the defendants. This official request came two months before the five-year limitations period would have expired on May 9, 1995, absent any suspension. It stated, in relevant part:

<u>TESTIMONY NEEDED</u>

The prosecutor requests interviews with several persons in Germany and further requests that she and an agent of the Federal Bureau of Investigation be permitted to be present for all interviews. With respect to the interview in Munich of Heribert Tenschert, the prosecutor requests that a judge or magistrate conduct the proceedings. With respect to all other witnesses, police interviews will be sufficient. The prosecutor also seeks

4

to view and photograph or copy documents and other evidence presently in the possession of persons or institutions in Germany. Please interview the following persons at the indicated locations:

1. Berlin

A. Dr. Klaus Maurice, Secretary General of the Cultural Foundation of the States,... Dr. Maurice is expected to have information and documents regarding the agreement by The Cultural Foundation of the States to purchase the Samuhel Gospels....

On March 3, 1995, the Government, based upon this official request, filed an *ex parte* application for suspension of the running of the statute of limitations pursuant to 18 U.S.C. § 3292. The district court granted the application.

On June 2, 1995, Assistant U.S. Attorney Carol Johnson and FBI Special Agent Mike Krenek participated in an interview by the German police of Dr. Maurice. During the interview Dr. Maurice provided the German police with documents relating to the purchase of the Gospels and promised to produce additional documents and ledgers to the German police. On June 7, 1995, all interviews of witnesses sought in the government's official request were completed.

On August 23, 1995, and September 7, 1995, the Office of International Affairs (OIA) in the U.S. Department of Justice received documents sent by German officials that were responsive to the March 2, 1995 official request. The OIA forwarded those documents to Assistant U.S. Attorney Johnson.

On October 27, 1995, the German Ministry of Justice sent a letter to the OIA stating, in relevant part:

5

I have the honor of transmitting to you the following items in satisfaction of the above request which have turned up in Bavaria....

According to my documentation, the request has now been completely satisfied. I therefore consider my function to be concluded.[1]

On November 7, 1995, OIA forwarded these additional documents from German authorities to AUSA Johnson. The OIA attorney cautioned that AUSA Johnson should review the enclosed documents carefully to determine if the German government had fully complied with the official request.

On November 14, 1995, AUSA Johnson responded that additional documents were required since Dr. Maurice had not yet provided the accounting statements and ledgers promised to them during the police interview on June 2, 1995. However, at this time the prosecution chose not to seek an official letter of request to the German government requesting its assistance in obtaining the accounting statements and ledgers from Dr. Maurice. Significantly, the prosecution also did not request the district court to continue suspension of the limitations period.

On December 21, 1995, the OIA attorney notified German officials that the documents which Dr. Maurice had agreed to produce during the police interview had not been received and requested that the documents be supplied "as soon as possible."

---

[1] This is the U.S. government's translation of the letter. The defendants claim that the last sentence in this letter in the original German is actually stronger in its indication of finality than the government's English translation suggests. They contend that a more accurate translation of this last sentence should read as follows: "I therefore consider my record [in this case] to be closed."

Again, the government requested no extension of the suspension of limitations earlier ordered.  Rather, the government accelerated its efforts to obtain an indictment, working through the Christmas holiday.  The prosecutors were plainly not waiting for the additional production of documents before asking the grand jury to indict the defendants.

On January 4, 1996, the grand jury indicted Meador, Cook and Torigian for conspiring to receive, possess, conceal, store, barter, sell and dispose of stolen goods and for receiving, possessing, concealing, storing, bartering, selling and disposing of stolen goods.

The German government did not respond until March 31, 1996. At that time, it sent a memorandum from the Police President in Berlin stating that Dr. Maurice had sent the documents to the U.S. Consulate in Frankfurt, Germany, to the attention of Special Agent Richard Tamplin of the FBI on January 31, 1996.  SA Tamplin had forwarded these documents to SA Krenek.

The defendants, Meador, Cook and Torigian, moved to dismiss the indictment urging the statute of limitations.  On October 18, 1996, at the final pretrial hearing, the Government conceded that the last overt act in furtherance of the alleged conspiracy was taken on May 9, 1990.  Thus, May 9, 1995 was the expiration date under the statute of limitations for all charged offenses, absent a suspension under 18 U.S.C. § 3292.  If the request was complete and final action occurred on June 7, 1995, when all the interviews had been conducted and all documents had been gathered, then the

7

limitations period was suspended for a period of 97 days, from March 2, 1995 (the date of the official request) to June 7, 1995. If the October 27, 1995 letterSSstating that the request had been "completely satisfied" and the German official's function was "concluded"SSwas the "final action", then the statute of limitations was suspended for a period of 239 days. If the limitations period was suspended for 97 days, it would have expired on August 14, 1995. Had it been suspended for 239 days, it would have expired on January 3, 1996SSone day before the indictment was returned.

On October 22, 1996, the District Court dismissed all counts of the indictment against the defendants, concluding they were barred by the statute of limitations. The District Court held that "final action" within the meaning of 18 U.S.C. § 3292(b) had occurred on June 7, 1995, or, at the latest, on October 27, 1995, and hence, the indictment was barred by the running of the statute of limitations.

After the District Court issued a final order dismissing the indictment, the government sought leave to add a letter received on January 2, 1997 from the German Ministry to the record. The District Court denied the request, explaining:

> [M]uch of the evidence [in the letter] was "created" in response to the letter of AUSA Johnson after the Court issued a final opinion dismissing the final indictment in this case. ... [T]his Court has no authority to allow the government's letters to be added to the appellate record.

Apparently, AUSA Johnson had asked the OIA to contact the German Ministry for clarification and confirmation that the ledgers and

8

documents obtained from Dr. Maurice were indeed in response to the United States' original request sent on March 2, 1995.

The January 2, 1997 letter from the German Ministry, an Addendum to the Government's Appeal Brief, confirms that the documents sent by Dr. Maurice to FBI Special Agent Richard Tamplin were in response to the Government's official request for legal assistance. The defendants have moved this Court to dismiss the appeal or, alternatively, to strike the addendum to the government's brief and to impose sanctions against the government because the government's appeal brief contains the January 2, 1997 letter, which is not part of the district court record in this case. Given our disposition of the case, we do not reach this motion. The United States now appeals the order dismissing the indictment.[2]

## II.

## A.

The parties disagree as to the appropriate standard of review. Not surprisingly, the government characterizes the district court's findings as pure questions of law that are subject to *de novo* review, while the defendants claim that the findings are factual, reviewable only for clear error.

---

[2] Meador and Cook originally cross-appealed the district court's refusal to dismiss the indictment on other grounds, but abandoned their cross-appeal in their brief. This court, reading the abandonment of the cross-appeal as a motion to dismiss pursuant to Rule 42, granted that motion.

The determination of what is a "final action" is a mixed question of law and fact. To the extent that the district court's finding involves discerning a legal standard for "final action" from the statute, it is a question of law. See United States v. Richberg, 398 F.2d 523, 526 (5th Cir. 1968) (noting that meaning of word "club" within statute is a question of law once the underlying facts have been determined). But when the district court merely determines the applicable facts and circumstances in this case, those determinations are factual. Therefore, while we review the district court's findings of the underlying facts for clear error, we review the ultimate conclusion of "final action" de novo. See, e.g., United States v. Muniz-Melchor, 894 F.2d 1430, 1439 n.9 (5th Cir.), cert. denied, 495 U.S. 923 (1990) (outlining a mixed standard of review). Where the district court has reviewed evidence and heard testimony and determined whether a given action by the foreign authority was responsive to the U.S. government's official request, we review that determination for clear error. But where the district court has used these factual findings to determine when "final action" took place, we review those legal conclusions de novo.

### B.

The central issue here is the proper statutory interpretation of the term "final action." 18 U.S.C. § 3292(b) (1985). There are four dates at which there may have been a "final action" in this case. The earliest date is June 7, 1995, when the last of the

10

interviews of the German witnesses were concluded and the documents produced at those interviews were handed over.  The next date is October 27, 1995, when the German Ministry of Justice sent the letter stating that it considered its "function to be concluded".  The third and fourth dates are January 31, 1996, when Dr. Klaus Maurice sent additional documents to FBI Special Agent Richard Tamplin, and March 31, 1996, when the German government officially notified the U.S. about the production of those documents.

The government contends that "final action" did not occur until either of the last two dates, January 31, 1996, or March 31, 1996, and hence its prosecution is not time-barred.  It urges that "final action" occurs only when it is satisfied that all the evidence that may be responsive to its official request for assistance has been produced, regardless of the foreign government's determination that it has completed its response to the official request for evidence.

We begin our analysis with the statute.  18 U.S.C. § 3292 states:

> § 3292.  <u>Suspension of limitations to permit United States to obtain foreign evidence</u>
>     (a)(1) Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.
>     (2) The court shall rule upon such application not later than thirty days after the filing of the application.

(b) Except as provided in subsection (c) of this section, *a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.*

(c) The total of all periods of suspension under this section with respect to an offense§§

(1) *shall not exceed three years;* and

(2) shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section.

(d) As used in this section, the term "official request" means a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country.

18 U.S.C. § 3292 (1985) (emphasis added). Under subsection (b), the period of suspension ends when "the foreign court or authority takes final action on the [government's official] request." 18 U.S.C. § 3292(b) (1985). The term "final action" in subsection (b) is not defined in the statute.

Section 3292 was part of the Comprehensive Crime Control Act of 1984. It was enacted "to extend statute of limitation and Speedy Trial Act deadlines when evidence located in foreign countries must be obtained" and "to make foreign-kept business records more readily admissible into evidence in criminal trials in United States courts." H.R. Rep. No. 98-907, at 2-3 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3578. There is little case law interpreting this statute and none from this court. See United States v. Bischel, 61 F.3d 1429 (9th Cir. 1995); United States v. Miller, 830 F.2d 1073 (9th Cir. 1987), cert. denied, 485 U.S. 1033 (1988); United States v. Neill, 952 F. Supp. 831 (D.D.C. 1996).

12

The Ninth Circuit decision in United States v. Bischel, 61 F.3d 1429 (9th Cir. 1995), is the only case that has interpreted the term "final action" in § 3292(b). In Bischel, the British government turned over to the United States all of the requested records, but delayed certifying their authenticity, although authentication had been requested by the U.S. government. Id. at 1431. Bischel argued that "final action" took place when the British government turned over all the documents. Id. at 1434. The prosecutors argued, and the Ninth Circuit agreed, that "final action" occurred only when the foreign government made a "dispositive response" to every item requestedSSincluding turning over the records and certifying their authenticity, as requested by the U.S. government. Id. Rejecting Bischel's argument, the Ninth Circuit refused to hold that "final action" takes place when the last of the records requested by the U.S. government had been received. Id. The Ninth Circuit noted that "there is no ready way of knowing when the last of anything has happened." Id. Instead, it pegged "final action" to a dispositive response from the foreign government to each item set out in the U.S. government's official request. Id. at 1433-34 (noting that "pegging 'final action' to disposition, up or down, of each of the items in the official request provides a more certain benchmark by which to measure whether the action that has been taken is 'final' or not.").

We concur with the reading of "final action" in Bischel. We are persuaded that a determination of when "final action" has been taken by a foreign government, within the meaning of § 3292(b),

13

must turn on whether a dispositive response to an official request for evidence from our government has been obtained. Certainly, a response to an official request for evidence can be only a first stage of evidence gathering and not a "final action." However, when the foreign government believes it has completed its engagement and communicates that belief to our government, that foreign government has taken a "final action" for the purposes of § 3292(b).

In this case, when the German Ministry of Justice sent a letter on October 27, 1995 stating that it believed that it had completely satisfied the government's official request and considered its function to be concluded, it took a "final action."

Under the government's interpretation of this statute "final action" by the foreign authority takes place when the prosecutor determines that she has received all the evidence responsive to the official request. Defendants reply that "final action" is to be determined from the subjective purpose of the foreign authority to conclude its work.

The government's position that only when it is satisfied with the evidence provided has there been a final action by the foreign government is untenable. Under the government's view, any response to its official request is not complete and thus not final until it decides it is final, subject to only the three-year limit on the suspension period in § 3292(c)(1). This reading would rend the statutory scheme detailed in § 3292. If Congress wished to provide the government with a blanket three-year suspension period to

collect evidence from foreign countries, it could have done so.  It bears emphasis that Congress did not provide a direct role for the district court in terminating a running suspension period, such as requiring periodic findings by the court to determine if a "final action" had been taken.  Rather, Congress gave the government a maximum suspension period of three years to gather evidence and within that three year period, the suspension period ends when the foreign government takes a final action on its official request. We believe that hinging "final action" to a dispositive response by the foreign government is consistent with this statutory scheme and strikes a bright-line test for terminating the suspension period.

Our reading of the statute will not frustrate Congressional purpose by hampering the government in obtaining evidence from foreign countries.  If dissatisfied with a dispositive response from a foreign authority, the prosecutor need only file another request and seek a further suspension of the limitations period, subject to the ultimate three-year limitation on the suspension period.[3]

The government maintains that its position is consistent with Bischel, since there was no "dispositive response" from the German government until all the documents had been turned over to them in January.  We are not persuaded.  Bischel rejected the argument the government is making here that "final action" takes place only when the last of the records requested have been received.  See Bischel,

---

[3]  This assumes that final action does not come until after the original period of limitations would have run without any suspension.  See 18 U.S.C. § 3292(c)(2) (1985).

15

61 F.3d at 1434. Indeed, <u>Bischel</u> noted that "there is no ready way of knowing when the last of anything has happened." <u>Id</u>. We need not rest there and do not, but <u>Bischel</u> is at least support for the theory that "final action" occurred on June 7, 1995, when the interviews were completed. Certainly so for October 27, 1995, when the German Ministry sent the letter stating that its function was concluded. On the earlier date, the German government had in fact disposed of every item requested by the U.S. By the October 27 letter, the foreign government had to its lights made its "disposition, up or down," of every item in the government's official request. Stated differently, by October 27, 1995, the German Ministry had either turned over the information it had (an "up"), or indicated that no further information would be forthcoming (a "down").

The government also makes the related argument that whether a document is deemed responsive to an official request for evidence ought to be measured *ex poste*. Under this view, whenever a document that is in any way relevant to a broadly-worded official request is turned over, the limitations period must be suspended up to that point. In this case, since the documents turned over by Dr. Maurice in January 1996 may be, with the benefit of hindsight, considered relevant to the agreement by the Foundation to purchase the Samuhel Gospels, the suspension period ought to continue till then. This is contrary to the "negative" measure of responsiveness used in <u>Bischel</u>. There, the question asked was whether the response to the request objectively met its demands. <u>Cf</u>. <u>Bischel</u>,

16

61 F.3d at 1433. If it did so, a later additional response would not alter the finality of the first response, it being facially complete. Relatedly, it follows that a response that is not facially complete in responding to the calls of the request must find its finality in an accompanying clear statement of the responding foreign agency or official.

We are persuaded that the latter, negative standard of <u>Bischel</u> is the correct one. There must be a certain and definitive end to the suspension period, a point at which "final action" can be plainly located. If the period is suspended retroactively whenever another relevant document comes in, there will be no certain end. See <u>Bischel</u>, 61 F.3d at 1434 ("[T]here is no ready way of knowing when the last of anything has happened.").

We do not decide whether Dr. Maurice's document search and production in January, 1996, was an action taken by a German "authority" and whether it was responsive to the original March 2, 1995 official request to the German government. We hold that the October 27, 1995 letter by the German government stating that it had "completely satisfied" the government's official request and considered its "function to be concluded" is a dispositive response that constitutes a "final action" for the purposes of § 3292(b), thus ending the suspension period on that day. It follows that the statute of limitations expired on January 3, 1996, one day before the indictment was handed down, after being suspended for 239 days from March 2, 1995 to October 27, 1995.

17

C.

Our preference for a strict, bright-line standard for "final action" is a product of the general rule of strict adherence to statutes of limitation.  See, e.g., United States v. Marion, 404 U.S. 307, 322 n.14 (1971).  As the Supreme Court has noted, statutes of limitation

> represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice; they "are made for the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defense." [St. Louis] Public Schools v. Walker, 76 U.S. (9 Wall.) 282, 288 (1870).  These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced.

Marion, 404 U.S. at 322.  Moreover, "criminal limitations statutes are 'to be liberally interpreted in favor of repose.'" Toussie v. United States, 397 U.S. 112, 115 (1970) (quoting United States v. Scharton, 285 U.S. 518, 522 (1932)).  While their operation in some cases deprives society of its ability to prosecute criminal offenses, that is the price we pay for repose.  Furthermore, "[s]uch a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity."  Marion, 404 U.S. at 323 (quoting Toussie, 397 U.S. at 114-15).

The purpose of § 3292, apparent from its structure and legislative history, is to compensate for "delays attendant in obtaining records from other countries."  H.R. Rep. No. 98-907, at 2-3 (1984), reprinted in 1984 U.S.C.C.A.N. 3579.  This provision should not be an affirmative benefit to prosecutors, suspending the

18

limitations period, pending completion of an investigation, whenever evidence is located in a foreign land. It is not a statutory grant of authority to extend the limitations period by three years at the prosecutors' option.

We AFFIRM the district court's dismissal of the indictment.

<span style="color:red">ENDRECORD</span>

EDITH H. JONES, Circuit Judge, dissenting:

Although my colleagues' opinion does not say so directly, I believe they are concerned about the apparent injustice surrounding this prosecution and the government's possible attempt to "manufacture" post-hoc evidence in its favor. Such sympathies may not be misplaced, but they have resulted in an interpretation of "final action" by a foreign government that will yield results both uncertain and detrimental to the government's legitimate prosecutorial interests in an increasingly globalized community. I therefore respectfully dissent.

First, I am not as concerned as the majority about attempting to fashion a "bright-line rule" for "final action" under this statutory extension of the statute of limitations. The majority say they do not want to promote prosecutorial foot-dragging. But Congress has set an outer limit on the extension of statutes of limitations for these purposes -- three years -- and I see no reason for niggling the government about reasonable developments that occur within the three-year period. Yet that is what the majority has done by applying its "foreign government subjective test" and artificially ignoring the full range of German responses to the prosecutorial request. The purpose of this statute was to facilitate, not turn into a game, the cumbersome process of obtaining evidence from foreign governments.

20

Second, the "bright-line" test of the majority is both ephemeral and unrealistic. To say that a foreign government's "final action" depends on <u>that</u> government's "subjective interpretation" of when it has fully complied with the request for evidence makes American law dependent on the customs and bureaucratic language of foreign cultures rather than on a sound application of American policy.[4] The meaninglessness of this "bright line" is obvious in the present context: although the German government allegedly closed its books on this matter in October, 1995, it continued to funnel documents to the U.S. for several months afterwards. I marvel that the majority can decipher the foreign government's "subjective intent" when the German government's actions and words are so contradictory. Indeed, I suspect that more often than not conflicting signals will emanate from official foreign communications, just as they routinely do within and among multi-layered bureaucracies everywhere. The majority's "foreign government subjective test" will rarely reflect reality. Instead, we should look to the full range of events surrounding the German government's response, the outer bounds of which comfortably -- and well within the three-year limit -- protect the timeliness of the indictment. So viewed, the "final

---

[4]The majority sets up a straw man in arguing that the government advocates judicial deference to the government's interpretation of what constitutes final action. I cannot find such an argument in the government's brief. Instead, the government appears to contend, as I do, that "final action" must be interpreted realistically.

action" occurred either in January 1996 or in March of that year, when the last documents responsive to the American request were transmitted.

It should be noted here that the *Bischel* opinion, mentioning dispositive action by the foreign government, supports the majority's position in form but not in substance. In *Bischel*, the Ninth Circuit refused to confine the interpretation of "final action" merely to the physical production of relevant documents, where the U.S. had also specifically requested a certificate of authenticity. The court opted for a broader rather than narrower construction of "final action" to include the complete response of the foreign government to the full request. *Bischel* is thus not inconsistent with the position I take. In fact, the indictment was rendered in *Bischel* before "final action" had occurred, inasmuch as no certification of authenticity had yet been received, and British officials were continuing discussions on certification even after the date of indictment. Here, where the German government was plainly continuing to cooperate with American authorities even after its letter of October 1995, to secure Dr. Maurice's documents that were plainly within the scope of the request, I cannot see how *Bischel* would compel a finding that "final action" occurred before the train of events was complete.

Third, the majority's decision, by confusing the interpretation of the tolling provision, will encourage the government to enlarge its foreign evidence request as much as

possible to extend the tolling period. The government's brief aptly points out one source of confusion, in a case where, as here, the government's "dispositive response" is in fact incorrect:

> The appropriate action in response to an incorrect letter indicating that full compliance has been made is for the government to consult with the foreign authority and detail the documents requested but not provided. Accepting the trial court's decision that a letter incorrectly indicating that it has satisfied the official request constitutes final action would result in a statute of limitations beginning to run on either the date on which that letter was sent or on the date upon which the letter was received. A determination of which event reinstitutes the limitation period could potentially effect [sic] the decision of whether the statute barred prosecution. Additionally accepting the trial court's decision requires that the statute of limitations continues to run while the government takes additional steps to ensure compliance with its official request for assistance. Specifically, the government would be required to write, translate, and send a duplicative and second official request for assistance and to file an ex parte motion to toll the limitation period. Because the statute of limitations would continue to run while the government seeks the production of documents originally requested, the trial court's ruling subverts the legislature's intention in enacting 18 U.S.C. 3292 [to accommodate delays in obtaining evidence from abroad].

The government's self-defense mechanism in response to the majority's ruling must be to formulate overbroad requests for foreign evidence and thus to keep the limitations ball in the air as long as possible while trying to avoid erroneous or misleading "final action" statements by the foreign authorities. The majority's result is self-defeating.

This decision works no large injustice, certainly not to its beneficiaries in the present case, but it creates unnecessary

23

complications for law enforcement and, in my view, undermines the intent of Congress.

I respectfully dissent.