[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 17, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-11082

_____

D.C. Docket No. 00-00479-CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GABRIEL TORRES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 17, 2003)**

Before WILSON and FAY, Circuit Judges, and MILLS*, District Judge.

WILSON, Circuit Judge:

_____
*Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

In an effort to avoid the running of the statute of limitations in a criminal case, the government obtained a suspension of the limitations period pursuant to 18 U.S.C. § 3292. This statute permits the tolling of the limitations period so that the government may pursue an official request for evidence located in a foreign country. The tolling begins at the time of the official request and concludes when the foreign government takes "final action" on the request. *Id*. § 3292(b). In this appeal, we decide, in an issue of first impression in this Circuit, what constitutes "final action" within the meaning of § 3292.

## BACKGROUND

From the late 1980s through February of 1995 Gabriel Torres, the director of Garces Commercial College, and other employees of the college, were involved in a scheme to defraud the United States Department of Education by filing fraudulent Pell Grant applications.[1] Their bogus submissions generated millions of dollars, which they eventually concealed in corporate bank accounts located in the Isle of Man. Subsequently, the government began investigating Torres and other Garces College employees for their involvement in the Pell Grant fraud.

---

[1]The Pell Grant Program is a program that was created to assist students who demonstrate financial need with the payment of their tuition at institutions of higher education. *See* 20 U.S.C. § 1070(a)(1). Pell Grants are administered through the Department of Education. *See id.* (providing that the Secretary of Education carries out the program).

In furtherance of its pending investigation, on July 9, 1999, the government made a formal Mutual Legal Assistance Treaty (MLAT) request through the Department of Justice's Office of International Affairs (OIA) for international assistance in obtaining evidence located in the Isle of Man.[2]  After the MLAT request, the government submitted an ex parte application to the district court for a suspension of the statute of limitations pursuant to § 3292.  The district court granted the government's application, suspending the statute of limitations "for the period beginning on July 9, 1999, and ending on the date the Isle of Mann [sic] takes final action on the request for evidence."

The Isle of Man first responded to the government's MLAT request on November 12, 1999.  At that time, Detective Constable Annie Kneale of the Isle of Man's Constabulary Fraud Squad transmitted the Isle of Man's response to the OIA.  Specifically, she sent documents that the government requested in its MLAT request and a facsimile cover sheet stating, "Enclosed is the information you require."  When the government received the documents from the OIA, however, it

---

[2]The request, which was sent to the attorney general of the Isle of Man, detailed the nature of the fraud and related offenses; identified several individuals and corporations under investigation, including Torres; explained that money from the fraud had been funneled to offshore accounts located in the Isle of Man; and itemized the records that the government sought from the Isle of Man.

discovered that the Isle of Man had not included several documents that it requested.[3]

Thereafter, on January 12, 2000, without requesting an extension of its motion to toll the statute of limitations, the government, through the OIA, renewed its request to the Isle of Man. In the OIA's supplemental request, it asked the Isle of Man to provide the omitted documents, noting that they "were the subject of [its] original re[q]uest."[4] On March 8, 2000, pursuant to the government's supplemental request, Detective Constable Kneale transmitted the documents that she originally sent in addition to the documents that she previously omitted. This time, the cover sheet accompanying the transmission provided, "Enclosed are all documents that Barclays Bank PLC Isle of Man hold on the above investigation."

After receiving all of the evidence that the government had requested from the Isle of Man, a grand jury returned an indictment against Torres and a codefendant on June 16, 2000 for making false and fraudulent claims with the

---

[3]Although the Isle of Man provided the government with bank statements for six bank accounts at the Isle of Man Branch of Barclays Bank PLC as the government requested, it did not provide authenticated copies of checks, deposit and withdrawal slips, and transfer documents for those accounts.

[4]Unbeknownst to the government, the Isle of Man closed its file on November 15, 1999 and opened a new file upon receipt of the government's second request.

Department of Education.  Then, on June 29, 2000, the grand jury returned a thirty-eight-count superseding indictment against Torres and eight other defendants, charging Torres with conspiracy and related substantive charges for wire fraud, money laundering, and false claims.  Torres moved to dismiss the indictments, arguing that the claims therein were time-barred under 18 U.S.C. § 3282, which provides for a five-year statute of limitations.

In support of his motion to dismiss, Torres argued that the Isle of Man took "final action" on November 12, 1999, the date of its first response to the government's request for evidence.  Hence, he argued that the government had until May 5, 2000 to indict him for the crimes alleged in the original indictment, as those crimes were completed no later than December 30, 1994 (the date Garces College closed), and until June 28, 2000 to file its superseding indictment, as the last overt act in support of the superseding indictment occurred on February 23, 1995 (the date of the alleged transfer of funds from Garces College to the individual accounts).[5]  Accordingly, Torres argued that because the original

---

[5]Normally, the limitations period begins to run on the date on which the crime is complete.  *United States v. Gilbert*, 136 F.3d 1451, 1453 (11th Cir. 1998).  Some offenses, such as conspiracy, however, are deemed "continuing offenses," because they are committed over a period of time.  *Id.*  For continuing offenses, the statute of limitations commences on the date of the last overt act in furtherance of the crime.  *Id.* at 1453 & n.4.

indictment was returned on June 16, 2000 and the superseding indictment was returned on June 29, 2000, both were untimely and the charges therein should be dismissed.

The district court disagreed, however, finding "that 'final action' on the request was not taken until March 8, 2000, and that the statute of limitations was therefore tolled for a period of 242 days, and the charges contained in the indictment were brought within the period of the limitation." Subsequently, Torres entered into a plea agreement in which he pled guilty to one count of conspiracy to commit money laundering, but preserved his right to appeal the district court's denial of his motion to dismiss the indictment. This appeal followed.

## DISCUSSION

The determination of what constitutes "final action" for purposes of § 3292 is a mixed question of law and fact. *See United States v. Meador*, 138 F.3d 986, 991 (5th Cir. 1998) (applying a mixed standard of review to its determination of what constitutes "final action" under § 3292). While "[w]e . . . review the district court's conclusions of law *de novo*," we review its determination of the underlying

facts and circumstances for clear error. *Miles v. Naval Aviation Museum Found., Inc.*, 289 F.3d 715, 720 (11th Cir. 2002).[6]

Our determination of what constitutes "final action" under § 3292 begins with the language of the statute itself. *See Fed. Reserve Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1239 (11th Cir. 2000) (stating that "the starting point for all statutory interpretation is the language of the statute"). Under § 3292, the government may apply, ex parte, for suspension of the statute of limitations when it seeks evidence located in a foreign country. *See* 18 U.S.C. § 3292. The statute provides that

> [u]pon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the

---

[6]Additionally, when reviewing the district court's denial of a defendant's motion to dismiss an indictment, we apply an abuse of discretion standard. *United States v. Quiala*, 19 F.3d 569, 570 (11th Cir. 1994). Also, we review de novo "the district court's interpretation and application of the statute of limitations." *Gilbert*, 136 F.3d at 1453. Here, however, both our evaluation of the district court's denial of Torres's motion to dismiss and our review of its application of the statute of limitations turn on the meaning of the statutory phrase "final action," which requires de novo review. *See United States v. Hooshmand*, 931 F.2d 725, 737 (11th Cir. 1991) (stating that "[t]he interpretation of a statute is a question of law subject to *de novo* review").

request was made, that such evidence is, or was, in such foreign country.

*Id.* § 3292(a)(1). Subject to guidelines set forth in § 3292(c), the tolling of the statute "begin[s] on the date on which the official request is made and end[s] on the date on which the foreign court or authority takes *final action* on the request." *Id.* § 3292(b) (emphasis added). Significantly, however, the statute does not define "final action." Moreover, when read in its entirety, the statute does not provide any guidance as to when "final action" occurs. *See CBS Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1225 (11th Cir. 2001) (providing that when the plain language of a statute does not resolve the meaning of a statutory phrase, courts should "focus[] on the broader, statutory context" before turning to extrinsic evidence).

As the plain language of the statute itself does not resolve the ambiguity of the phrase "final action," we turn to the legislative history for guidance. *Thomas*, 220 F.3d at 1239 (providing that when "the statutory language is ambiguous . . . courts may examine extrinsic materials, including legislative history, to determine Congressional intent"). In looking to the legislative history, we "'consider the purpose, the subject matter and the condition of affairs which led to its enactment, and so construe it as to effectuate and not destroy the spirit and force of the law

8

and not to render it absurd.'" *United States v. DBB, Inc.*, 180 F.3d 1277, 1283 (11th Cir. 1999) (quoting *Lambur v. Yates*, 148 F.2d 137, 139 (8th Cir. 1945)).

Our review of the legislative history provides some guidance. Indeed, the purpose of § 3292 "is to make foreign-kept business records more readily admissible into evidence in criminal trials in United States courts and to extend statute of limitation and Speedy Trial Act deadlines when evidence located in foreign countries must be obtained." H.R. Rep. No. 98-907, at 2 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3578, 3578. The statute furthers an important law enforcement objective. Congress was prompted to enact § 3292 as part of the Comprehensive Crime Control Act of 1984 by "[t]he [increasing] use of offshore banks to launder the proceeds of criminal activities" and the difficulty that federal prosecutors were having "in obtaining records from those banks in both the investigative and trial stages of a prosecution." *Id.* As the procedures to obtain such evidence "generally take a considerable period of time to complete," efforts to recover evidence located in foreign countries often resulted in statute of limitations problems. *Id.* at 2–3. Thus, in enacting § 3292, Congress sought to facilitate the prosecution of these criminal acts by affording prosecutors enough time to obtain evidence located in foreign countries. *See id.* at 4 (recognizing that "[t]he bill also . . . permits a Federal court, upon application of the prosecutor, to suspend the

running of the statute of limitation for such time as is necessary (up to 3 years) to obtain evidence from a foreign country").

Although the underlying Congressional intent of § 3292 does provide us some assistance in determining when a foreign country takes "final action," we are still left without a clear-cut definition of "final action" as the legislative history does not define nor otherwise indicate what Congress intended to signal "final action." We do, however, find some assistance from two of our sister circuits, the Fifth Circuit and the Ninth Circuit, which have directly addressed this issue. *See Meador*, 138 F.3d at 986; *United States v. Bischel*, 61 F.3d 1429 (9th Cir. 1995).

In *Bischel*, the Ninth Circuit addressed whether "final action" occurred when the United Kingdom produced all of the documents requested by the government except for one – a certificate authenticating the documents. 61 F.3d at 1432. The court held that "final action" had not occurred, because the United Kingdom had not sent all of the documents requested by the government. *Id.* at 1431. It reasoned that "final action" requires a dispositive response by the foreign government to all of the items set forth in the official request. *Id.* at 1431, 1434.

In *Meador*, the Fifth Circuit concurred with the Ninth Circuit's rule "pegg[ing] 'final action' to a dispositive response from the foreign government to each item set out in the U.S. government's official request." 138 F.3d at 992.

Ultimately, however, the Fifth Circuit found more narrowly that "final action" occurs "when the foreign government believes that it has completed its engagement [and fully complied with the request] and communicates that belief to our government." *Id.* The court reasoned "that hinging 'final action' to a dispositive response by the foreign government . . . strikes a bright-line test for terminating the suspension period." *Id.* at 993.[7]

Torres argues that this case is indistinguishable from *Meador* and that we should adopt the Fifth Circuit's bright-line test, under which "final action" would have occurred on November 12, 1999 when Detective Constable Kneale transmitted the Isle of Man's first response to the government's request. We, however, decline to adopt the *Meador* test as we find that it creates a result that is inconsistent with the Congressional intent underlying § 3292.[8] *See id.* at 995–96

_____

[7]Throughout its opinion, the majority in *Meador* focused heavily upon the Ninth Circuit's statement that "'[t]here is no ready way of knowing when the last of anything has happened.'" 138 F.3d at 994 (quoting *Bischel*, 61 F.3d at 1434). In support of its bright-line test, it reasoned that "[t]here must be a certain and definitive end to the suspension period, a point at which 'final action' can be plainly located." *Id.* Although in form *Meador* is consistent with *Bischel*, we find the Fifth Circuit's opinion in *Meador* substantively more narrow as it requires only that the foreign government think that is has provided a complete response, whereas, in *Bischel*, the Ninth Circuit required a complete response to the government's original request. *Id.* at 995 (Jones, J., dissenting).

[8]We are not bound by the Fifth Circuit's decision in *Meador*. *See OSI, Inc. v. United States*, 285 F.3d 947, 952 n.3 (11th Cir. 2002) (noting that "we are not

11

(Jones, J., dissenting) (finding that conditioning "final action" on a foreign government's determination that it has fully complied with the government's request "undermines the intent of Congress" as it is contrary to § 3292's underlying purpose). Indeed, under the *Meador* test, § 3292 turns on the subjective opinion of foreign countries – whether correct or not – rather than on an objective assessment of whether the responding country's submissions were, in fact, complete. *See id.* at 995 (Jones, J., dissenting). Congress's intent of "facilitat[ing] . . . the cumbersome process of obtaining evidence from foreign governments" is not furthered by a test that disregards the completeness of a foreign government's response and instead "makes American law dependent on the customs and bureaucratic language of foreign cultures rather than on a sound application of American policy." *Id.* at 995–96 (Jones, J., dissenting); *see also* H.R. Rep. No. 98-907, at 2 (stating that "[t]he purpose of the [statute] is to make foreign-kept business records more readily admissible"). Certainly, there is no need to create a test that *requires* the government to reapply for a suspension of the limitations period where, as here, the foreign government inadvertently omitted documents

bound by decisions of our sister circuits").

that fell within the scope of the government's original request for which it had already obtained a suspension.[9]

We do, however, share some of the concerns that the Fifth Circuit expressed in *Meador* – namely, leaving it up to the prosecutor to decide when "final action" has taken place. *See Meador*, 138 F.3d at 993. Congress could not have intended that the prosecutor be vested with the unlimited discretion to make this determination, as doing so would provide the government with the potential to delay the case and deprive the defendant of the benefits of the limitations period to which he is statutorily entitled. Congress obviously took that possibility into consideration, however, when it implemented the two safeguards in § 3292(c). First, subsection (c)(1) puts a three-year limit on the suspension period. 18 U.S.C.

---

[9]Torres argues that the government's January 12th supplemental request was beyond the scope of the district court's suspension order. Although the government concedes that the district court's order suspending the statute of limitations applies only to its initial request, it argues that because the documents it sought in its supplemental request were documents that it specifically asked for in the original request, its supplemental request fell within the scope of the district court's suspension order. We agree. We do not interpret § 3292 to prohibit the government from making a supplemental request for documents that it requested in its original request when the foreign government fails to produce those documents. Such a reading of § 3292 is consistent with Congressional intent. *See* H.R. Rep. No. 98-907, at 2 (providing that "[t]he purpose of the [statute] is to make foreign-kept business records more readily admissible"); *see also Meador*, 138 F.3d at 995 (Jones, J., dissenting) (finding that "[t]he purpose of th[e] statute was to facilitate, not turn into a game, the cumbersome process of obtaining evidence from foreign governments").

§ 3292(c)(1) (providing that "[t]he total of all periods of suspension under this section with respect to an offense . . . shall not exceed three years"). Second, if the foreign government takes final action "before the statute of limitations would otherwise expire," "[s]ubsection (c)(2) limits the period of suspension to six months." *Bischel*, 61 F.3d at 1432;[10] *see also* 18 U.S.C. § 3292(c)(2) (providing that "the [t]otal of all periods of suspension under this section . . . shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section").

Yet, the better practice by the government is to request an extension of the suspension period when it believes that the official request for information from the foreign government has been nonresponsive or incomplete. The district court could then consider whether a new or supplemental request to the foreign government for additional information is appropriate or whether the original response is truly complete. When in doubt, it is the preferable practice that the government ask the district court for an extension rather than make its own

---

[10]We agree with the Ninth Circuit's interpretation of § 3292(c)(2), explaining that it "limits the time of tolling to six months when both the official request and the 'final action' occur within the normal period of limitations." *Bischel*, 61 F.3d at 1433.

14

subjective decision on finality. Such a practice avoids unnecessary delay and placing the defendant at the whim of the prosecutor.[11] It also avoids placing the prosecutor at the whim of the foreign government.

CONCLUSION

We adopt the Ninth Circuit's broader construction of "final action," which focuses the inquiry upon the foreign government's dispositive response to each item listed in the official request. *See Bischel*, 61 F.3d at 1433–34. We hold that "final action" for the purposes of § 3292(b) occurs when a foreign court or authority provides a dispositive response to each of the items listed in the government's official request for information. Accordingly, as the Isle of Man's initial response on November 12, 1999 was incomplete – it inadvertently omitted several documents that were within the subject matter of the government's original

---

[11]Statutes of limitations serve an important function in our adversarial system, especially in criminal law. Although, in some instances, criminal statutes of limitations operate to preclude the prosecution of criminal acts, they "have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." *Toussie v. United States*, 397 U.S. 112, 114–15 (1970). Moreover, criminal statutes of limitations ensure the defendant's right to a fair trial, as they are implemented by the legislature to ensure "the repose of society and the protection of those who may (during the limitation) . . . have lost their means of defense." *Meador*, 138 F.3d at 994 (alteration in original) (internal quotation marks omitted). Additionally, they create a means of predictability by specifying the point at which "a defendant's right to a fair trial would be prejudiced." *Id.* (internal quotation marks omitted).

15

MLAT request, and the statement on the cover sheet did not provide a dispositive response concerning the omitted documents – it did not take "final action" on that date. Indeed, as the district court found, the Isle of Man did not take "final action" until March 8, 2000 when it provided a clear, dispositive, and unambiguous response to each item in the government's original request. We are unable to find on this record that this factual determination by the district court is clearly erroneous. In its March 8, 2000 response, the Isle of Man provided the omitted documents and communicated to the government on the accompanying facsimile cover sheet, "Enclosed are all documents that Barclays Bank PLC Isle of Man hold on the above investigation." *See id.* Therefore, under the district court's suspension order, the statute of limitations was tolled from July 9, 1999 to March 8, 2000 – a total of 242 days. As such, the charges against Torres in both indictments were timely.

Accordingly, we AFFIRM the district court's denial of Torres's motion to dismiss the indictment.[12]

_____

[12]Our holding does not ignore the possibility that a foreign government may not be able to produce each and every document or comply with each request for evidence that the government makes. Instead, the phrase "dispositive response" refers to a foreign government's response to each requested item, even if its response simply communicates that it cannot comply. For example, the Isle of Man stated in its March 8, 2000 response, "Enclosed are all documents that Barclays Bank PLC Isle of Man hold on the above investigation." That statement

unambiguously alerted the government that the Isle of Man had responded to its request as completely as possible.