**UNITED STATES of America**

**v.**

**Luigi RATTI, Defendant.**

**Crim. No. PJM 03–0330.**

United States District Court,
D. Maryland.

Feb. 1, 2005.

David Farnham, Douglas Stearn, Washington, D.C., for Plaintiff.

Barbara Van Gelder, Fred Fielding, Judah Best, Washington, D.C., for Defendants.

## AMENDED OPINION

MESSITTE, District Judge.

### I. Introduction

Luigi Ratti has been charged in a Superseding Indictment with six counts of wire fraud in violation of 18 U.S.C. § 1343; one count of conspiracy in violation of 18 U.S.C. § 371; three counts of false statement within the jurisdiction of a federal agency in violation of 18 U.S.C. § 1001; and two counts of shipment in interstate commerce of adulterated drugs in violation of 21 U.S.C. § 331(a) and 333(a)(2).

According to the Indictment, Ratti, former Chief Executive Officer and Chairman of the Board of Directors of Biochimica Opos, S.p.A. (Opos), an Italian company,[1] orchestrated a scheme to falsify manufacturing records and regulatory submissions to the U.S. Food and Drug Administration (FDA) with respect to an antibiotic known as Cefaclor as well as other drug products. The false statements related to the sites and processes involved in the manufacture of the drugs and were purportedly made so that the FDA would not prohibit the importation of drugs into the United States.

Ratti and the Government have filed several motions clustering around two issues:

- First, whether the charges against him have been brought within the applicable period of limitations;
- Second, and ultimately related to the first issue, whether a proffer agreement between the Government and

---

1. At all relevant times Opos was a wholly-owned subsidiary of Roussel Uclaf, a corporation operating under the laws of France. Ratti was also 50% owner and Chief Executive Officer of Archimica, another Italian corporation alleged to have participated in the fraudulent scheme.

Ratti was breached by him, such that the Government should be free to use his proffered statements in its case-in-chief at trial. Or, on the other hand, whether the Government has breached the agreement, such that the July 16, 2003 Indictment in these proceedings should be dismissed. In conjunction with the latter, Ratti has moved the Court for leave to inspect the record of the proceedings before the September 2004 Grand Jury that returned the Superseding Indictment, or in the alternative, to have the Court conduct an *in camera* review of the record to determine the extent to which the deliberations of the second Grand Jury may have been tainted by the first Grand Jury's improper consideration of the proffer statements.

## II. *Statute of Limitations*

A) Each of the crimes with which Ratti is charged is subject to a five-year statute of limitations. *See* 18 U.S.C. § 3292(a). Where, however, a criminal prosecution depends on obtaining evidence from a foreign jurisdiction, provided certain conditions are met, the statute of limitations for crimes may be extended for up to three years. *See* 18 U.S.C. § 3292. Ratti contends that those conditions were not met in this case and that his prosecution on all charges is time-barred. The Government submits that it has complied with all the conditions of Section 3292 and that the first Indictment returned in this case on July 16, 2003 fell within the eight year total limitations period provided under Section 3292.

The statute sets the stage for the discussion which follows:

**§ 3292. Suspension of limitations to permit United States to obtain foreign evidence**

(a) (1) Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

(2) The Court shall rule upon such application not later than thirty days after the filing of the application.

(b) Except as provided in subsection (c) of this section, a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.

(c) The total of all periods of suspension under this section with respect to an offense-

(1) shall not exceed three years; and

(2) shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section.

(d) As used in this section, the term "official request" means a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having criminal law

enforcement responsibility, to a court or other authority of a foreign country.

B) On April 10, 1998, the Government prepared a Multilateral Assistance Treaty (MLAT) request to Italy, which was delivered on or about April 28, 1998. By its terms, the request to the Italian authorities was "for [a]ssistance in the [i]nvestigation of [e]mployees of Roussel Uclaf; Roussel Corporation; and Biochemica Opos S.p.A." The opening paragraph indicated that an Assistant Attorney General for the United States was conducting an investigation to determine whether employees of Roussel Uclaf ... Roussel Corporation ... and Opos ... violated United States criminal laws by the importation of Italian-made antibiotics into the United States that had not been approved by the United States Food and Drug Administration ... and by making false statements to officials of the FDA about the processes used to manufacture these drugs. The request asked the Italian authorities to: (1) compel the production of Opos documents and have them authenticated as business records by an appropriate custodian; and (2) interview at least eight individuals including Luigi Ratti, as well as Mario Moretti, a former Opos production manager, and a "Mr." Potere, a former Opos production supervisor. All the prospective interviewees were identified as individuals who had been named as responsible individuals in FDA inspection of Opos or Archimica. The request asked that each of these individuals be questioned about whether, among others, "Luigi Ratti ... Opos employees, or Roussel employees [knew] about or [played] a role" in outsourcing the manufacture of the drugs or in any attempt to mislead the FDA or any customer about practices of the corporations.

Responding to the request, Italian Magistrates interviewed most of the named individuals, including Ratti, all but one of whom invoked the right of an accused under Italian law not to testify.[2]

Pursuant to a subsequent request for assistance made on August 12, 1999, the Italian authorities were asked to interview four additional individuals including Alfonso Piccolo, director of quality control at Opos. Although Piccolo eventually made an appearance before an Italian court, no record of that proceeding was ever forwarded to the United States.

Certain problems developed with regard to the production of the requested documents in authenticated form, which will be discussed in greater detail presently. In any case, by November 15, 2000, the authenticated documents appear to have been delivered to the United States. On the other hand, the Italian authorities had submitted no information by that time as to interviews with Moretti and Potere nor had they delivered a transcript of the Piccolo interview. To this day, according to the Government, it has received no information as to Moretti, Potere, or Piccolo.

Meanwhile, on October 25, 1999, the Government filed an application with this Court (Williams, J.), seeking approval under 18 U.S.C. § 3292 for suspension of the statute of limitations relative to possible crimes of Roussel Uclaf and Opos. The application, which was neither verified nor supported by affidavits, was accompanied by a copy in English and Italian of the MLAT request to Italy as well as an unsworn letter from Opos's United States counsel, written on the letterhead of his law firm, Covington and Burling, a Dis-

---

**2.** One of the named individuals turned out to be wrongly identified and was not interrogated.

trict of Columbia firm. Attached to counsel's letter were 45 pages describing in general the contents of 679 boxes of Opos documents that counsel represented were located in Milan. While the application described the nature of the FDA's investigation in summary fashion, the MLAT request set forth in greater detail the nature of the investigation, the history of the FDA's request to the Italian authorities to date, and the reasons why the Government believed that relevant evidence was located in Italy.

The application also indicated that a formal request had been made to authorities in Romania, where certain of the illegal manufacturing activities of the target defendants were believed to have taken place. In fact, as the Government eventually had to admit, no request had been made to the Romanian authorities as of that time, although there is no indication that the Government knowingly misrepresented this fact to the Court.[3]

On October 25, 1999, Judge Williams signed an Order suspending the statute of limitations in the case. In the Order, he found by a preponderance of evidence that official requests had been made for evidence to Italy and Romania related, *inter alia*, to the suspected offenses of introduction into interstate commerce of adulterated drugs, the making of false material statements within the jurisdiction of a federal agency, and conspiracy. The Order made no reference to possible wire fraud. The Order suspended the statute of limitations for these offenses beginning April 10, 1998, the date on which the Government's first official requests had been made to Italy and supposedly to Romania, "until the date on which the Central Authority of Italy and the Central Authority of Romania have taken final action on said requests."

On October 19, 2001, Roussel Uclaf entered into a plea agreement with the Government.[4] Plea discussions with Ratti continued through the Fall of 2001, but were thereafter suspended.

On July 16, 2003, a Grand Jury impaneled in this district returned an indictment charging Ratti with the offenses referenced in the opening paragraph of this Opinion.

Assuming the validity of the October, 1999 application under Section 3292 and the maximum 3 year extension for each offense with which Ratti was eventually charged, the timeliness of the July 2003 indictment is reflected in the following chart:

### STATUTE OF LIMITATIONS FOR ALL CHARGES

| CHARGE | ALLEGED DATE | 5 YR EXPIRATION | 8 YR EXPIRATION | ORIGINAL INDICTMENT |
|---|---|---|---|---|
| Wire Fraud | 7/27/1995 | 7/27/2000 | 7/27/2003 | 7/16/2003 |
| Wire Fraud | 9/5/1995 | 9/5/2000 | 9/5/2003 | 7/16/2003 |
| Wire Fraud | 9/5/1995 | 9/5/2000 | 9/5/2003 | 7/16/2003 |

3. On the other hand, the Government did not bring the fact of its non-application to the Court as soon as the error was discovered. It remained for Ratti and his counsel to bring it to light in the course of the present proceedings.

4. Roussel Uclaf pleaded guilty to conspiracy and introduction of adulterated drugs in interstate commerce and paid a fine and suffered forfeitures in the amount of $33.0 million.

| | | | |
|---|---|---|---|
| Wire Fraud | 9/12/1995 | 9/12/2000 | 9/12/2003 | 7/16/2003 |
| Wire Fraud | 7/3/1996 | 7/3/2001 | 7/3/2004 | 7/16/2003 |
| Wire Fraud | 7/9/1996 | 7/9/2001 | 7/9/2004 | 7/16/2003 |
| Conspiracy | J/S/O 1996 | J/S/O 2001 | J/S/O 2004 | 7/16/2003 |
| False Statements | 10/17/1995 | 10/17/2000 | 10/17/2003 | 7/16/2003 |
| False Statements | 10/18/1995 | 10/18/2000 | 10/18/2003 | 7/16/2003 |
| False Statements | 10/19/1995 | 10/19/2000 | 10/19/2003 | 7/16/2003 |
| Adulteration | 10/5/1995 | 10/5/2000 | 10/5/2003 | 7/16/2003 |
| Adulteration | 10/12/1995 | 10/12/2000 | 10/12/2003 | 7/16/2003 |

C) Ratti makes a number of arguments regarding Section 3292 and its tolling provisions:

1) That Judge Williams's Order of October 25, 1999, is invalid because (a) it was entered *ex parte;* (b) it did not refer to Ratti or any offenses he may have committed; (c) it was based on a false premise regarding the application to Romania; and, (d) it was not supported by a preponderance of the evidence;

2) That Italy took final action on the MLAT request as early as April 8, 2000, but certainly no later than November 15, 2000, which, under Section 3292, would result in end dates for limitations well before of the July 16, 2003 indictment; and

3) That the Government did not exercise due diligence in its pursuit of evidence from Italy.

The Government disputes each of these propositions. As a failsafe, on September 13, 2004, it filed a further application to suspend the statute of limitations to correct any possible errors in the earlier filing.[5]

D) 1) Ratti argues first that, given its *ex parte* nature, the Government cannot rely on the 1999 suspension order to extend the statute of limitations, citing *In re Grand Jury Investigation,* 3 F.Supp.2d 82, 83 (D.Mass.1998). ("Nothing in section 3292 ... expressly contemplates secretly extending certain statutes of limitations as to certain individuals. Such a course would implicate due process concerns ... Moreover ... *ex parte* practice ... fundamentally undercuts the values secured by the adversary process.") The suggestion is that the target of the investigation should have an opportunity to oppose the prosecutors' assertion that limitations should be tolled.

■ The Government responds that Judge Williams was not required to hold a contested hearing prior to issuing the suspension order and the Court agrees. The cases have so held, stressing not only that the statute and the legislative history are silent as to whether notice to anyone is required, *United States v. King,* 2000 WL 362026, *20 (W.D.N.Y.2000); *DeGeorge v. U.S. Dist. Ct. for Cent. Dist. of Cal.,* 219 F.3d 930, 937 (9th Cir.2000), but equally important that a notice requirement would be inconsistent with the concept of grand jury secrecy. *Id.*

---

**5.** Actually this is the Government's third application to suspend the statute of limitations, the first being the October 1999 filing and the second having been filed on July 30, 2004. The latter application was withdrawn when the Government realized that it continued to contain reference to the Romanian application. Although Section 3292 directs that the Court shall rule upon an application to suspend limitations within 30 days after the filing of the application, 18 U.S.C. § 3292(a)(2), Ratti asked the Court to defer ruling pending its decision of related issues in the case and the Court agreed to do so.

■ 2) Ratti then cites *United States v. Neill,* 952 F.Supp. 831, 833 (D.D.C.1996) for the proposition that limitations can only be tolled under Section 3292 with regard to specifically enumerated offenses and specifically named targets. The 1999 application, he says, was captioned *"In Re Grand Jury Investigation of Roussel Uclaf, S.A. and Biochemical Opos S.p.A."* and referred to corporate activities which the Government believed constituted, among other things, the introduction into interstate commerce of adulterated drugs, the making of false statements within the jurisdiction of a federal agency, and conspiracy. Wire fraud was not mentioned nor was Luigi Ratti named as a subject of the MLAT request.

The Government disputes that Section 3292 requires either offense—or offender—specificity, also citing *Neill.*

*Neill* appears to be the central authority on point, and in the Court's view the Government reads the opinion correctly. So long as the offenses designated in the request to the foreign government and in the Section 3292 application are reasonably specific to elicit evidence probative of the offenses under investigation, the application is in order. *Neill,* 952 F.Supp. at 833, especially Note 2. To hold otherwise would be "unreasonably formalistic." *Id; accord, United States v. Wilson,* 249 F.3d at 366, 374 (5th Cir.2001).

Nor is Section 3292 "person specific." *Neill,* 952 F.Supp. at 833. Not only does Section 3292 refer solely to offenses as opposed to persons, such an "interpretation would penalize the Government for lack of omniscience as to who was involved in offenses under investigation." *Id.* at 833–34.

In the present case, the wire fraud counts are intimately related to the general scheme to defraud that was under investigation in connection with all other counts eventually brought against Ratti, counts which were specifically referenced to the 1999 suspension application. Similarly Ratti's role was highlighted in the MLAT request to Italy. As President and Chairman of the Board, he was a key employee of Opos, one of the principal targets of the investigation. The Italian authorities were specifically asked to inquire of the named witnesses whether they knew of Ratti's participation in the potentially illegal manufacturing procedures and cover-ups. Indeed, based on the request, it appears that when Ratti was summoned to give a statement in Italy, the Italian authorities found him to be under investigation and permitted him to refuse to answer questions precisely because he was deemed to be a target in connection with the litigation.

The Court finds the MLAT application to Italy was sufficient to extend to Ratti and to all the offenses with which he was ultimately charged.

■ 3) Ratti next attacks the Government's 1999 application to Judge Williams and his Order on the grounds that both were based on a false premise. Specifically, the Government represented to the Court that as of October 25, 1999, an official request for evidence had been made to Romania when in fact that was not the case. In fact the prosecution did not send such an official request until June 2002, some three years later. Ratti cites in this regard *United States v. Wilson,* 322 F.3d 353 (5th Cir.2003), which involved the overturning of a conviction where a district court incorrectly determined that an official request had been made to a foreign government.

The Government argues that any misrepresentation made with regard to a request to Romania was not made in bad faith. It submits that in all other respects the application was accurate and that the Order can be sustained on the basis of the MLAT application to Italy alone. Indeed

the Government no longer relies on the Romanian request to extend limitations, as reflected in its recent application to the Court to extend limitations which omits any reference to the Romanian request.

The Court agrees that the misrepresentation as to Romania in 1999 does not vitiate Judge Williams's Order. There has been no showing of bad faith on the Government's part and, while the Government's failure to verify that a request had been made to Romania is hardly commendable, the fact remains that the allegations regarding the MLAT application to Italy were accurate and, if the application was otherwise in proper form, sufficient to sustain the Order.

Therein, however, lies a further problem according to Ratti. The application was not, he says, otherwise in proper form, a question which the Court next considers.

■ 4) Ratti contends that the 1999 suspension order is invalid even as to Italy because the Government's application to the Court did not satisfy the preponderance of the evidence requirement of Section 3292. He argues that two conditions precedent are required to secure the suspension of limitations:

- First, an official request for evidence must have been made to the foreign authority prior to the application to the Court; and

- Second, the Government must demonstrate in its application "by a preponderance of the evidence ... that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country." 18 U.S.C. § 3292(a)(1).

Ratti argues that the Government failed to submit any reliable evidence as to the existence of evidence in Italy since its application was neither verified nor accompanied by affidavits. Apart from a copy of

the MLAT request to Italy, he says, it contained little more than the unsworn assertions of the Assistant U.S. Attorneys making the application.

The Government believes its initial application to Judge Williams was adequate from an evidentiary standpoint even if it lacked verification or affidavits. There was and is no question that a request had in fact been made to the Italian authorities at the time of the application to Judge Williams, and there was ample reason to believe that evidence could be found in Italy relative to the investigation. Not only was the MLAT request to Italy (both in English and Italian) attached to the application; it was accompanied by a letter from U.S. counsel for Opos (on the letterhead of a prominent District of Columbia law firm), as well as a multi-page index to some 679 boxes of Opos documents that counsel said were located in Milan.

*United States v. Trainor*, 376 F.3d 1325 (11th Cir.2004), recently decided by the Eleventh Circuit, is directly on point. *Trainor* was a prosecution for securities fraud and related offenses in which the Justice Department's Office of International Affairs (OIA) had sought evidence from the Ministry of Justice of Switzerland. The request described the alleged fraudulent scheme under investigation and identified one Schweitzer as an individual whose testimony was being sought. While the request was pending, the Government filed an *ex parte* sealed motion under Section 3292 with the U.S. District Court for the Southern District of Florida, seeking to toll limitations. A copy of the OIA request was attached to the motion but, as the Eleventh Circuit eventually found, the covering Government memorandum contained a single paragraph which, in very general terms, described evidence in the Government's possession suggesting that further evidence regarding Schweitzer was in

Switzerland. "No indicia of reliability, such as a verification or an affidavit, accompanied the application." 376 F.3d at 1333. The district court (not the same judge who had signed the § 3292 order) granted the defendant's motion to dismiss on the ground that the Government had not satisfied the preponderance of evidence standard set out in § 3292. The Eleventh Circuit affirmed.

Finding the "preponderance" standard to have a well-established judicial construction, it held that evidence "must [not only] tend to prove or disprove the existence of a material fact ... more importantly, for our purposes, [it] must include, or be accompanied by, some indicia of reliability." *Id.* at 1331. Indicia of reliability were deemed especially important because in an *ex parte* proceeding the Court needs to protect the absent defendant's rights and because a statute of limitations is meant to protect against overly stale criminal charges and potentially unreliable witnesses. A decision to toll, therefore, should be carefully made.

The court held that the brief summary in the application asserting that evidence was in Switzerland did not satisfy the Government's preponderance burden, noting again the absence of any verification or affidavit.

Since the Fourth Circuit has yet to address this issue, the Court will take *Trainor* as the standard. The question, then, is how the present case measures up. As in *Trainor*, no verification or affidavit accompanied the Section 3292 application here. As in *Trainor*, the Government's request to the foreign authority was attached to the application. Here, however, unlike in *Trainor*, the general reference in the application to the evidence of suspected illegal activities in Italy was extensively detailed in the MLAT request itself, which set forth what Roussel Uclaf and Opos employees were believed to have done in

Italy, including changing manufacturing sites and processes, taking steps to hide the changes, and creating false batch records regarding manufacturing procedures. Several individuals and companies believed to possess pertinent information, all having known or possible Italian addresses, were named in the MLAT request. Perhaps most importantly, attached to the application was the letter from Opos's U.S. counsel, on the letterhead of Covington and Burling, a well-established Washington law firm, which itself was backed by 45 pages describing the contents of 679 boxes of corporate data that Opos's counsel specifically represented were available in Milan.

The 1999 application, in short, consisted of considerably more evidence than the application in *Trainor*, despite its lack of formal verification or affidavits.

It cannot be denied that the present case is troublesome insofar as the application referred to the Romanian request. That representation was false and, if not made intentionally, was certainly made carelessly. At a minimum, the Government's misrepresentation as to the Romanian application underscores the importance of obtaining verification or affidavits with respect to representations in these applications. Moreover, the Government's failure to follow up on the Romanian request and promptly advise the Court after the suspension order was signed is a further cause for concern. In the future, the Government will have to pay far greater attention to the requirements of Section 3292 than it did in its 1999 application to Judge Williams.

But ultimately the only real deficiency of the 1999 application is its lack of verification or affidavits and this on account of what can only be understood as an oversight. Had the Assistant U.S. Attorney submitting the application merely added a

verification to the application,[6] there would hardly be an issue to speak of. The application would clearly have passed muster. *See Trainor,* 376 F.3d at 1333 ("The Government's evidence could even include hearsay evidence.") The Court finds that the application passes muster now, if barely. Having reached this decision, the Court finds it unnecessary to pass upon the Government's recent application to suspend the statute of limitations or the possible application of any doctrine of equitable tolling. The 1999 application was made within the normal limitations period and was and is valid. It remains to consider for how long the Order extended limitations. The Government says it did so for the full three years. Ratti says the extension was for a much shorter period, either because the Italian authorities took final action in the matter on April 8, 2000 or by no later than November 15, 2000, or because the Government failed to exercise due diligence in pursuing the foreign evidence in Italy. In either case, says Ratti, the July 2003 indictment fell outside the extended limitations period.

■ E) Ratti argues that the Italian "court authority" to which "an official request [was] made" took final action on April 8, 2000, thereby triggering the six-month maximum suspension period of 18 U.S.C. § 3292(c), which would bar all counts of the July, 2003 indictment as out of time. *See United States v. Meador,* 138 F.3d 986, 992–93 (5th Cir.1998).

Alternatively, says Ratti, the Italian authorities took "final action" at the latest on November 15, 2000, again adding at most six months to the limitations period, still well before the July, 2003 indictment.

The Government submits that Italy did not take final action on the MLAT request prior to the return of the July, 2003 indictment and, in fact, it says, the Italian Government has yet to provide responses to certain of its requests.

Although "final action" by the foreign authority determines the end of the tolling period under Section 3292, the statute does not define the term. Two appellate cases, however, have addressed the issue and both hold that some clear definitive act on the part of the foreign authority is required to constitute "final action" within the meaning of the statute. *See United States v. Bischel,* 61 F.3d 1429, 1434 (9th Cir.1995) (There must be "a dispositive response ... to both the request for records and for a certificate of authenticity."); *Meador,* 138 F.3d at 992 (5th Cir.1998) (Determination of when "final action" has been taken by foreign government must turn on whether a dispositive response to an official request for evidence from our government has been obtained ... foreign government must communicate belief to U.S. Government that it has taken a "final action").

In the present case, Ratti's reference to the April 8, 2000 date is somewhat obscure. That appears to be the date upon which an Italian magistrate sent documents to the Department of Justice which a Department of Justice trial attorney referred to in a letter dated June 13, 2000 as "the last set of documents received." "Last" in Ratti's view apparently means "there are no more." "Last," however, can also mean "the most recent," as opposed to "there are no more." A letter from a Department of Justice trial attorney of June 13, 2000 to the OIA unquestionably supports the latter construction since it expressly states that whatever documents had been received by the Department of Justice (DOJ) to date still needed

---

**6.** A Department of Justice trial attorney, who was one of the Government attorneys who made the 1999 application, has since added an affidavit which affirms the accuracy of at least the Italian part of the 1999 application.

to be authenticated and that sworn testimony still needed to be taken from an Opos representative relative to the documents.

Ratti's reference to November 15, 2000 as the "final action" date is no more persuasive. On that date, while a one sentence letter was sent to the DOJ by another Italian magistrate apparently responding to the request for authentication of documents, it in no way addressed to the Government's request that certain witnesses be interviewed, including but not limited to Messrs. Moretti, Potere, and Piccolo. Nor did the November 15, 2000 transmission in any way announce that it was the "final action" pursuant to the DOJ request.

It is true that thereafter, according to the Department of Justice trial attorney responsible for the case, "the United States received no additional packages from Italy." Does that establish November 15, 2000 as the date of Italy's "final action?"

The Court accepts that the Government cannot be the judge of what constitutes "final action" by a foreign government under Section 3292, *Meador*, 138 F.3d at 993–94. But most assuredly the Italian authorities in this case never made it clear that they had taken final action *vis-a-vis* the MLAT request and it is indisputable that certain requests still remained open as of November 15, 2000, *viz.* the interviews and/or reports of interviews with Messrs. Moretti, Potere, and Piccolo.

Perhaps, as suggested by the Eleventh Circuit in *United States v. Torres*, 318 F.3d 1058, 1064–65 (11th Cir.2003), it would have been "preferable practice that the Government ask the District Court for an extension rather than makes its own subjective decision on finality." But this

language is at most hortatory and, as *Bischel* expressly holds, there is no diligence requirement written into Section 3292. *Bischel*, 61 F.3d at 1435. The Court finds no reason to take a different view in this case.

■ The Court concludes that no final action was taken by the Italian authorities within the maximum three-year extension period under Section 3292. Moreover, the Court holds that the Government is not otherwise precluded from proceeding in this case based on any failure to exercise due diligence in its pursuit of evidence in Italy.[7] The maximum 3 year extension of limitations applies to each offense charged.

F) To sum up the Court's conclusions as to the limitations issue:

Despite its less than perfect application in 1999 under Section 3292, the Government has satisfied the requirements of the statute so as to obtain tolling of the statute of limitations. It in fact applied to the Italian authorities for evidence relative to possible offenses that might be encountered there. It made application within the original period of limitations and, while its representations regarding Romania were careless, they were not fatal. The representations were not demonstrably made in bad faith and the references to Italy independently sustained the application. Then, too, while the Government's omission of verification or affidavits was careless, it was not fatal. The absence of the verification was at most an oversight which was easily supplied after the fact, in addition to which there were other indicia of reliability. Furthermore, the application was sufficient in its description of the offenses under investigation and its potential targets to cover all the offenses Ratti was eventually charged with. The Court

---

7. Accordingly, the Court finds it unnecessary to decide whether any delay in the obtaining evidence in Italy was attributable to Ratti or to the Government.

is satisfied that no final action was taken by the Italian Government with regard to the MLAT request within the three-year period and that in any event there was and is no obligation on the Government's part to act with any particular dispatch in seeking the information from a foreign government under MLAT. The Court finds that the statute of limitations in this case extends for a full eight years for each of the acts charged in the Indictment.

As a result, unless the Indictment issued on July 16, 2003 is otherwise invalid, the question of limitations is moot. All charges against Ratti would have been have been brought within the eight-year extended period. If, on the other hand, the July 2003 Indictment is defective and subject to dismissal, then, unless the Superseding Indictment of September 13, 2004 was timely, the Government's case may be in jeopardy.

The Court considers the validity *vel non* of the July 2003 Indictment.

### III. *The Proffer Agreement*

A) The Government's original targets in this case were Roussel Uclaf, the French company that at all relevant times wholly-owned Opos, and Opos itself. As just noted, in the course of its investigation, through collaboration with Italian authorities, the Government sought to interview employees of the two entities and to collect appropriate documents from abroad. Ratti, as President and CEO of Opos, was key among the employees the Government sought to debrief. Eventually he was brought to the United States from Italy and through counsel began to negotiate a Proffer Agreement. By November 17, 1998, such an agreement had been finalized.[8]

On November 17 and 18, 1998, Government counsel interviewed Ratti at the FDA Office of Special Prosecutions in Beltsville, Maryland. Ratti was accompanied by three U.S. and one Italian counsel as well as an Italian language interpreter. Approximately two weeks later, on FDA Office of Criminal Prosecutions letterhead, Government agents prepared a ten-page single-spaced Memorandum of Interview (MOI), summarizing the various representations, including potentially self-incriminating statements, Ratti was understood to have made. At or about the same time, the principal Government attorney assigned to the case pronounced himself satisfied with the truthfulness and completeness of Ratti's statements.

Subsequent developments caused this attorney and his DOJ colleagues to change their minds. After Roussel Uclaf entered a guilty plea to conspiracy and the introduction of adulterated drugs in interstate commerce, resulting in a multi-million dollar criminal fine and civil forfeitures, and after Roussel Uclaf and Opos employees gave statements or reached agreements with the Government, the Government decided to proceed against Ratti alone. Accordingly, in June, 2003, Government counsel went before a Grand Jury in this district, had a Government agent in effect tell the Grand Jurors that Ratti had "lied" in his debriefing, and introduced the full ten-page Ratti MOI for the Grand Jury to consider. The Government also submitted other evidence pertaining to Ratti's alleged misdeeds, including testimony of live witnesses and summary evidence of interviews with other witnesses.

On July 13, 2003, the Grand Jury returned the twelve count Indictment against Ratti referenced in the opening paragraph of this Opinion.

■ B) Ratti maintains that the Government's introduction of the MOI was in direct contravention of the Proffer Agree-

---

8. The full text of the Proffer Agreement is set forth as Appendix A to this Opinion.

ment and, since the resulting Indictment was irreparably tainted, it should be dismissed. The Government says that at all times it acted in a manner fully consistent with the Agreement and that the Indictment remains valid.

Ratti continues: The Agreement sharply limits the Government's use of his statements to prosecutions for perjury, false statements, or obstruction of justice, although it may also, if Ratti is determined to have made a statement inconsistent with the statements provided, use the earlier statements for cross-evidence or rebuttal purposes. In no way, he says, does the Agreement authorize the Government to take his immunized statements to the Grand Jury and seek his indictment based upon them. The Government points to the clause in Paragraph 2 of the Agreement which supposedly gives it the right to "make whatever use it desires of such information during any proceeding preliminary to an action trial." The Government argues that a Grand Jury proceeding is a "proceeding preliminary to trial."

█ C) In the context of interpreting plea agreements, which are closely analogous to immunity agreements, the Fourth Circuit has observed that "courts have necessarily drawn on the most relevant body of developed rules and principles of private law, those pertaining to the formation and interpretation of commercial contracts ... But the courts have recognized that those rules have to be applied to plea agreements with two things in mind ... First, the defendant's underlying 'contract' right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law ... Second, with respect to federal prosecutions, the courts' concerns run even wider than protection of the defendant's individual constitutional

rights—to concerns for the honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *United States v. Harvey,* 791 F.2d 294, 300 (4th Cir.1986) (citing *United States v. Carter,* 454 F.2d 426, 428 (4th Cir.1972)) The language of an immunity contract "is to be read as a whole and given a reasonable interpretation." *United States v. Irvine,* 756 F.2d 708, 710 (9th Cir.1985). Any ambiguity in the agreement must be construed "strictly against the government in recognition of its superior bargaining power," *United States v. Aleman,* 286 F.3d 86, 90 (2d Cir.2002); *accord, United States v. Dudden,* 65 F.3d 1461, 1467 (9th Cir.1995); *Rowe v. Griffin,* 676 F.2d 524, 526 n. 4 (11th Cir.1982).

The Court is satisfied that Ratti has given the Proffer Agreement in this case the more reasonable reading. The Government's interpretation is strained and at best ambiguous, in which case the outcome still must favor Ratti.

The Court reasons thus:

The Agreement is divided into paragraphs. Paragraph 1 states the rule, *i.e.* that the Government will not use any statements made by Ratti or documents provided by him "during the proceeding against him in any criminal case except a prosecution for perjury, giving false statements, and/or obstruction of justice as set forth ... in Paragraph 3(b)." Paragraph 3(b) elaborates the procedure for pursuing such prosecutions and provides that, first, the district court in an appropriate proceeding must determine by a preponderance of evidence whether Ratti has been untruthful or has withheld material information so as to mislead the Government.[9]

---

9. The Government is also entitled, under Paragraph 3(a), to "use the information pro-

vided at the [proffer] meeting for cross-examination or rebuttal evidence."

Paragraph 2, upon which the Government bases its argument, deals with derivative use of the statement, carving out an exception to the rule stated in Paragraph 1. The first sentence of Paragraph 2 gives the Government "the right to make derivative use of and pursue all investigative leads suggested by any information provided by Mr. Ratti during the meeting." The second sentence says the Government "may also make whatever use it desires of the information during any proceeding preliminary to an actual trial." That means, in the Court's view, that, in addition to making derivative use of the statements to pursue investigative leads, the Government may also use the derivative evidence during any proceeding preliminary to a trial. The language does not, however, permit direct introduction of Ratti's statements to a Grand Jury in deciding whether to indict him for a crime. If that were so, as Ratti points out, the rule stated in Paragraph 1 would be swallowed up.

Finally, the transcript of the proceedings before the Grand Jury suggests that the Government was actually relying on Paragraph 3(b) of the Agreement as opposed to Paragraph 2 when it introduced the MOI. Thus the colloquy between the Government attorney and Government agent Pat Holland proceeded as follows:

Q. And in that interview, did Mr. Ratti say—there were certain conditions that he got out of that interview that reaffirmed to him. Is that correct?

A. That's correct.

Q. We couldn't use it at trial. Is that correct?

A. That's correct.

Q. But There's An Exception. What's The Exception? The Exception Is If He Lies, Correct?

A. That's correct.

\*      \*    .\*    \.   \*     .\*      \*

But Paragraph 2 of the Agreement, which the Government now relies on, does not confine the Government's use of Ratti's statements to circumstances where he lies. The Government can make whatever derivative use of the statements it cares to prior to an actual trial. It is Paragraph 3, particularly 3(b), which refers to the situation in which Ratti is deemed to have "lied." And in that case, before the Government may proceed with use of the statement, it must obtain a finding by the district court by a preponderance of the evidence that Ratti has not been truthful, a step of course which it never took in this case.

The authorities cited by the Government do nothing to advance its cause. As Ratti has shown, the agreements in both *United States v. Gerant,* 995 F.2d 505 (4th Cir. 1993) and *United States v. Seeright,* 978 F.2d 842 (4th Cir.1992) by their express terms reserved to the Government the right to make unfettered use of the defendant's statements in the event of their untruthfulness. *See United States v. Gerant,* 775 F.Supp. 182, 183–4 (D.Md.1991) (Agreement provided that "Government may use ... *for any purpose* any statements made or other information provided ... during the proffer" [Emphasis added.]) *Seeright,* it is true, contains broad language seemingly favorable to the Government's view. *Seeright,* 978 F.2d at 846 ("Once the district court found that Seeright had materially breached the agreement, the Government was free to use Seeright's statements for the proffer session."). But, as produced by Ratti's counsel in the present case, the actual proffer agreement in *Seeright* clearly provided that, should the Government conclude Seeright had not been completely truthful or candid, it could "use against you *for any purpose* any statements made or other information provided by you during the proffer" [Emphasis added].

These stand in marked contrast to the present case, where the Government's options are sharply defined and limited by the Agreement.[10]

The Court concludes that the Government's use of the Ratti MOI before the July 2003 Grand Jury was grossly inappropriate. The question is, what remedy should apply?

D) Ratti's position is that the taint of the MOI is not curable, that the Government cannot carry its "heavy burden" of showing otherwise. The Government maintains that, even if its use of the proffer was improper, dismissal is inappropriate. Ratti proceeds: The Government violated his Fifth Amendment privilege against self-incrimination when it submitted the MOI to the Grand Jury in his absence, without his knowledge and without giving him the opportunity to invoke his privilege and it did so by offering page after page of inculpatory statements on Government letterhead. Ratti relies principally on *United States v. Hinton*, 543 F.2d 1002 (2d Cir.1976), in support of the remedy of dismissal:

> Thus we conclude that there has been no compliance with the *Kastigar [v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)] requirement that the Government must affirmatively prove that the evidence against Hinton was derived from a wholly independent source; but we are now faced with the equally important issue of whether a hearing to ascertain whether the immunized testimony was improperly used is a fit remedy to be applied here. We are convinced that such a hearing on the question of taint would not suffice. Beyond the foreseeable difficulties of establishing at a hearing that the grand jurors, when they decided to indict, did not improperly use the immunized testimony or leads or evidence derived from it, for us to condone the practice of having the same grand jury that heard the immunized testimony indict the witness who so testified is to invite action where the cure is worse than the malady. The prospect of peering into the grand jurors' minds, or of examining them individually, to ascertain whether Hinton's testimony was improperly used, is both impractical and unpalatable. To so defile the secrecy of the grand jury process is to compound the problem the Government has created, rather than to alleviate it. The alternative of convening a grand jury distinct from that which heard the immunized testimony is not so onerous as to justify the jeopardizing of a defendant's Fifth Amendment rights. To hold otherwise is to permit intrusion into the long-approved common law secrecy of the grand jury process. (Footnote omitted)

543 F.2d at 1009–10.

The Government invites the Court's attention to Supreme Court cases for the proposition that, as a matter of law, a facially valid indictment will stand even if the Grand Jury has considered inadequate, incompetent or unconstitutional evidence. The Government cites, *inter alia, United States v. Calandra*, 414 U.S. 338, 344–45, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (... [T]he validity of an indictment is not affected by the character of the evidence considered. Thus an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence ... or even on the basis of informa-

---

**10.** It should be clear that the Court's ruling in this regard precludes the Government from using the MOI in its case-in-chief in the present trial, should the case survive. According-ly, the Government's Motion for a Finding of Breach of the Pre–Trial Agreement will be DENIED to the extent that the Government seeks to use the MOI in that respect.

tion obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination); *see also Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (Defendant could be required to stand trial and conviction would be sustained where only hearsay evidence was presented to grand jury).

Secondarily, the Government recognizes that, while some courts have dismissed indictments on the basis of prosecutorial misconduct, the Government's errors must be "deliberate" and "outrageous," *see e.g. United States v. Porter,* 909 F.2d 789, 792 (4th Cir.1990), a standard it contends has not been met here.

Finally the Government says that, apart from the MOI, the evidence necessary for the Grand Jury to return a true bill against Ratti was "far more ... than necessary," such that as a matter of law Ratti cannot show that any error in introducing the MOI was other than harmless and therefore insufficient to warrant dismissal. *See e.g. United States v. Pielago,* 135 F.3d 703, 708 (11th Cir.1998) (Court refused to dismiss indictment where it was alleged Government had breached proffer agreement where "the use of [the defendant's] proffer statement ... did not prejudice her"). In fact the Government believes the independent evidence to be so extensive that the Court, while it may if it cares to, need not review the record before the indicting Grand Jury.

The Court finds the Government's contentions seriously flawed.[11] As far as the *Costello–Calandra* rule is concerned, later cases from the Courts of Appeal have made an important and sensible distinction between the facts of *Costello* and *Calandra* and the facts before them. As the U.S. Court of Appeals for the District of Colum-

bia pointed out in *United States v. North,* 910 F.2d 843, 869 (D.C.Cir.1990):

The [*Costello–Calandra*] rule applies where the allegedly unlawful or unconstitutional action is independent of or prior to the consideration by the grand jury of that action's consequences. * * * Here, what is prohibited and unconstitutional under the Fifth Amendment in *Kastigar* is the *very presentation of the immunized testimony.* Where immunized testimony is used before a grand jury, the prohibited act is simultaneous and coterminous with the presentation; indeed they are one and the same. There is no independent violation that can be remedied by a device such as the exclusionary rule: the grand jury process itself is violated and corrupted and the indictment becomes indistinguishable from the constitutional and statutory transgression. The *Costello–Calandra* rule depends upon the distinction between the prohibited action and the presentation to the grand jury of the fruits of that prohibited action. *Kastigar* prohibits [its] use. (emphasis in original).

*See also United States v. Zielezinski,* 740 F.2d 727, 732 n. 3 ("The reference to Fifth Amendment violations in *Calandra* was limited to improprieties in the evidence-gathering process ... It does not speak to Fifth Amendment violations before the grand jury itself.") (citation omitted)

■ As for the Government's suggestion that the existence of substantial independent evidence before the Grand Jury supported the Indictment, which the Court may, it says, if it cares to, determine by reading the entire record of the Grand Jury proceeding, the Government misapprehends who has the burden of overcoming the error, what the burden consists of,

---

**11.** The Court chooses not to address the prosecutorial misconduct argument, which it finds peripheral to resolution of this case, if relevant at all.

and whether under the circumstances the party having the burden can realistically show that it has been carried.

The Court flatly rejects the Government's suggestion that Ratti has the burden of demonstrating plain error with regard to the Grand Jury's consideration of the MOI. Under *Kastigar,* the Government has the "heavy burden" of demonstrating that there is an independent and legitimate source for evidence that may be used against a witness who has given immunized testimony before the Grand Jury. *Kastigar v. United States,* 406 U.S. 441, 460–61, 92 S.Ct. 1653, 32 L.Ed.2d 212; *see also Neder v. United States,* 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *North,* 910 F.2d at 854.

Moreover, this burden is not met by merely pointing to other evidence, even if substantiated, that came before the Grand Jury. Given the constitutional dimension of the wrongful use of the MOI, the Government must demonstrate beyond a reasonable doubt that its introduction was harmless, *i.e.* it must show beyond a reasonable doubt that a reasonable Grand Jury would have returned the same indictment against Ratti absent the MOI. *See Neder,* 527 U.S. at 18, 119 S.Ct. 1827; *North,* 910 F.2d at 861; *cf. United States v. Curbelo,* 343 F.3d 273, 288 (4th Cir.2003) (When reviewing *non*-constitutional error under FED. R. CRIM. P. 52(a), the court must determine if Government has proved "with fair assurance ... that the judgment was not substantially swayed by the error.") (citing *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)) (emphasis added).

Finally, it remains to be considered whether the state of the record is such that the Court is able to decide, without further inquiry, whether the Government has carried its heavy burden of proof. Ratti says the Government "cannot seriously claim, let alone establish beyond

a reasonable doubt—that the Grand Jury made no use of MOI, hence a *Kastigar*-type hearing is unnecessary." The Government, for its part, confident of the sufficiency of the evidence that came before the Grand Jury, also says "such an exercise is unnecessary."

In the *Hinton* case, so heavily relied upon by Ratti, the Second Circuit announced what has been taken to be a *per se* rule, that the presentation of immunized testimony to the Grand Jury necessarily requires dismissal of the indictment. And, indeed, the Eighth Circuit has noted the possibility that the Government may not be able to meet its heavy burden and that "the district court may conclude that it is simply unreasonable to believe that the grand jury did not use, even in a subtle or subconscious way, any of the immunized testimony." *United States v. Garrett,* 797 F.2d 656, 664 (8th Cir.1986).

Nevertheless the Eighth Circuit itself and other Circuits have more commonly directed that in instances such as the present an evidentiary hearing should be held at which the Government has the opportunity to meet its burden of proof as to the sources of evidence presented to the Grand Jury. *See North,* 910 F.2d at 868–73; *Garrett,* 797 F.2d at 664–665; *United States v. Beery,* 678 F.2d 856, 863 (10th Cir.1982).

All things considered, the Court agrees that it would be appropriate to hold an evidentiary hearing in the present case and accordingly will do so. More about this in a moment.

For now, the Government makes one more thrust: Any issue of a Fifth Amendment violation before the July 2003 Grand Jury, it says, is rendered moot by the Superseding Indictment the second Grand Jury returned on September 13, 2004, a Grand Jury which was not told about the

Ratti MOI.[12] Ratti argues, however, that this has nothing to do with whether the July 2003 indictment should be dismissed since the Superseding Indictment would still be time-barred.

██ The Court agrees that, if the July 2003 indictment is dismissed, then, with one exception,[13] the September 13, 2004 Superseding Indictment would be time-barred. That is because, while a superseding indictment ordinarily relates back to a pending indictment for limitations purposes, a superseding indictment only relates back to a pending *valid* indictment. *See e.g. United States v. Crysopt*

*Corporation,* 781 F.Supp. 375, 377 (D.Md. 1991) (superseding indictment brought after limitations has expired is valid only if original indictment is valid); *accord, United States v. Gillespie,* 666 F.Supp. 1137, 1140 (N.D.Ill.1987).

If the prior indictment is dismissed as invalid, the tolling of the statute of limitations stops and the so-called "superseding indictment" is obliged to stand on its own *vis-a-vis* limitations. In the present case, if the July 2003 Indictment is dismissed, the Superseding Indictment will without doubt have been filed out of time, as the following chart shows:

### STATUTE OF LIMITATIONS FOR ALL CHARGES

| CHARGE | ALLEGED DATE | 5 YR EXPIRATION | 8 YR EXPIRATION | SUPERSEDING INDICTMENT |
|---|---|---|---|---|
| Wire Fraud | 7/27/1995 | 7/27/2000 | 7/27/2003 | 9/13/2004 |
| Wire Fraud | 9/5/1995 | 9/5/2000 | 9/5/2003 | 9/13/2004 |
| Wire Fraud | 9/5/1995 | 9/5/2000 | 9/5/2003 | 9/13/2004 |
| Wire Fraud | 9/12/1995 | 9/12/2000 | 9/12/2003 | 9/13/2004 |
| Wire Fraud | 7/3/1996 | 7/3/2001 | 7/3/2004 | 9/13/2004 |
| Wire Fraud | 7/9/1996 | 7/9/2001 | 7/9/2004 | 9/13/2004 |
| Conspiracy | J/S/O 1996 | J/S/O 2001 | J/S/O 2004 | 9/13/2004 |
| False Statements | 10/17/1995 | 10/17/2000 | 10/17/2003 | 9/13/2004 |
| False Statements | 10/18/1995 | 10/18/2000 | 10/18/2003 | 9/13/2004 |
| False Statements | 10/19/1995 | 10/19/2000 | 10/19/2003 | 9/13/2004 |
| Adulteration | 10/5/1995 | 10/5/2000 | 10/5/2003 | 9/13/2004 |
| Adulteration | 10/12/1995 | 10/12/2000 | 10/12/2003 | 9/13/2004 |

As a result, the validity *vel non* of the Superseding Indictment in this case will have to await the *Kastigar*-type hearing relative to the July 2003 indictment. Since it is clear that the Government improperly used the MOI before the July 2003 Grand Jury, the Government, as *North* suggests, 910 F.2d at 872–73, will have to demonstrate at the hearing that the introduction of the MOI was harmless beyond a reasonable doubt. The Court will then record its findings. If the Government's Grand Jury fails the *Kastigar* analysis, the Indictment will be dismissed and, but for Count 7, so will the Superseding Indictment.[14]

---

**12.** The Court's *in camera* review of the transcript of the proceedings before the Second Grand Jury indicates this to be the case.

**13.** The one exception would be Count 7, which alleges a conspiracy continuing through on or about October 9, 1996, less than eight years prior to the September 13, 2004 Superseding Indictment.

**14.** Neither the Government nor Ratti has explored the possible relevance of 18 U.S.C. § 3288 which, "whenever an indictment is dismissed for any reason" after limitations

A separate Order will be ENTERED implementing this Opinion.

## APPENDIX A

U.S. Department of Justice

Office of Consumer Litigation

| Trial Attorney | *First-class mail:* | *Overnight and hand deliveries only:* |
|---|---|---|
| *Writer's Direct Telephone: 202-...* | *P.O. Box 386* | *1331 Pennsylvania Ave., N.W.* |
| *Facsimile Telephone Number: 202-* | *Washington, D.C. 20044* | *Suite 950 North* |
| | | *Washington, D.C. 20004* |

DJ 21-52-366

November 3, 1998

Andrew Krulwich, Esq.
Wiley, Rein & Fielding
1776 K Street, N.W.
Washington, D.C.   20006

Re:   Meeting with Luigi Ratti

Dear Mr. Krulwich:

As we discussed, the United States government is interested in the possibility of Luigi Ratti supplying information concerning certain matters that may constitute criminal violations of United States law. The meeting would take place on November 17-18, 1998, at the Food and Drug Administration Office of Special Prosecutions in Beltsville, Maryland. The focus of our inquiry relates to false statements to the United States Food and Drug Administration and the illegal importation of adulterated or misbranded drugs. At this time you should consider Mr. Ratti to be a target of the government's investigation, meaning that the United States government presently anticipates that he may be charged with a criminal offense. This letter does not constitute a grant of immunity of any kind.

In order to ensure that there are no misunderstandings, I want to specify the ground rules for a meeting with your client.

1.   Except as otherwise provided in paragraphs two and three below, the United States government will not use any statements made by Mr. Ratti or any documents provided by Mr. Ratti during the proceeding against him in any criminal case except a prosecution for perjury, giving false statements, and/or obstruction of justice as set forth below in paragraph 3(b).

has expired, gives the Government an additional six calendar months from the dismissal to refile an indictment that would not be barred by limitations. The Court makes no ruling at this time with respect to the effect, if any, that this statute might have on the proceedings.

2.     The United States government reserves the right to make derivative use of, and pursue all investigative leads suggested by, any information provided by Mr. Ratti during the meeting. The United States government may also make whatever use it desires of such information during any proceeding preliminary to an actual trial. The United States government will not of its own initiative, absent legal process, provide the information provided during the meeting to authorities of foreign govenments.

3.     Mr. Ratti's complete truthfulness and candor are express material conditions of the representations made by the United States government in this letter. Therefore, the United States government may use information provided by Mr. Ratti under the following circumstances:

        a.     In the event that Mr. Ratti later says something (either in testimony or in an affidavit or statement) that is inconsistent in some way with information provided, the United States government can use the information provided at the meeting for cross-examination or rebuttal evidence.

        b.     If Mr. Ratti withholds material information to mislead the government or is not truthful or candid during the meeting, the United States government can use any such statements or documents in a prosecution for perjury, false statements, or obstruction of justice in which it is asserted that the statements or documents were either false or intentionally misleading. For purposes of determining whether the United States government may use any information provided by Mr. Ratti against him, the question whether or not he has been untruthful or has knowingly withheld material information to mislead the government during the meeting shall be determined by the presiding United States court in an appropriate proceeding at which his disclosures shall be admissible and at which the government shall be required to establish your client's untruthfulness or withholding of material information to mislead the government by a preponderance of the evidence.

4.     Mr. Ratti's appearance is voluntary, and he is free to choose not to answer any question. Mr. Ratti will not be detained in relation to this appearance in any way, and I am not aware of any reason whatsoever that Mr. Ratti would be detained upon his entry into the United States. Furthermore, the government does not consider Mr. Ratti's voluntary

appearance at this meeting to constitute a waiver of whatever rights he may have to contest personal jurisdiction in the future.

Sincerely,

Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
(202)

I have read and understood a copy of this letter in my native Italian and agree to be bound by it.

Io ho letto e capito una copia di questa lettera nella mia lingua originaria e sono d'accordo con le obligazioni consequenti dalla stessa.

Approved:

LUIGI RATTI

ANDREW KRULWICH, ESQ.

Dated: November 17, 1998

## ORDER

For the reasons set forth in the accompanying Opinion, it is this 31 day of January, 2005

**ORDERED:**

1) The Government's Application to Suspend Statute of Limitations [Paper No. 65.] is **MOOT**;

2) Defendant's Motion to Deny Further Suspension of the Statute of Limitations [Paper No. 59] is **MOOT**;

3) Defendant's Motion to Deny Third Application to Further Suspend the Statute of Limitations [Paper No. 69] is **MOOT**;

4) The Government's Motion for Finding of a Breach of Pretrial Agreement [Paper No. 36] is **DENIED**;

5) Defendant's Motion to Inspect the Grand Jury Record, or in the Alternative for In Camera Inspection by the Court [Paper No. 47] is **GRANTED** as to In Camera Inspection and **DENIED** as to Inspection of the Grand Jury Record;

6) Defendant's Motion to Dismiss Indictment for Improper Use of Proffer Agreement to the Grand Jury [Paper No. 38] is **DEFERRED** for future ruling;

7) Counsel shall contact Chambers to set up a *Kastigar*-type hearing rela-

tive to the Indictment of July 16, 2003;

8) All pending Motions to Seal are **GRANTED**.